STATE of Missouri, Respondent,

v.

Ike CRAWFORD, Appellant.

No. 63950.

Missouri Court of Appeals,
Eastern District,
Division Four.

June 20, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 14, 1995.

Application to Transfer Denied
Sept. 19, 1995.

Deborah B. Wafer, Asst. Public Defender, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

AHRENS, Presiding Judge.

Defendant Ike Crawford appeals the judgment of conviction for first degree murder, second degree murder, and two counts of armed criminal action. Defendant also appeals the denial, without an evidentiary hearing, of his *pro se* Rule 29.15 motion for postconviction relief. We affirm in part and remand in part.

On January 8, 1992, in the late evening hours, Antwon Williams, Glenn Carter, and Charles Brown entered a McDonald's restaurant in the City of St. Louis. Shortly after ordering food and sitting down to eat, defendant, his cousin, Greg Crawford, and Eric Downer entered the restaurant.

All the parties began to argue.[1] Workers in the restaurant believed that a fight was about to break out, so they asked the parties to leave the restaurant. Before the parties left the building, a fight ensued between Antwon and Greg. Shortly thereafter, all the members of both groups were fighting with each other.

As defendant was fighting with Glenn, a chain he wore around his neck broke and fell to the floor. As defendant grabbed the chain, Glenn told him to "let it go" and continued to hit defendant. Defendant then dropped the chain and Glenn picked it up.

McDonald's employees were able to break up the fight. Differing accounts of what occurred next were presented at trial. Without rehashing the testimony of all the witnesses, suffice it to say that defendant somehow obtained a gun, returned to confront his rivals and demanded his chain back.

■ Defendant testified[2] that after fighting with Glenn and losing his chain, although scared and physically hurt, he was intent on getting his chain back. Defendant also testified that his rivals made statements about breaking his jaw and killing him. Defendant saw Glenn and Antwon leave the restaurant and he then got up and proceeded out the door. Defendant immediately saw Eric who said "Here, man," and handed defendant a gun. Defendant was worried about the others beating him again. Defendant testified that he "circled back around" to ask them if he could get his chain back. When defendant was about five or six feet away from the others and asked for his chain back, Glenn noticed defendant had a gun and said "He's got a gun." Antwon, Glenn, and Charles ran past defendant and into the restaurant. Defendant testified that he made no gestures with the gun or pointed it at the others.

Defendant was close to the restaurant door. He followed the others into the restaurant and again asked for his chain. The others jumped over the counter and into the rear of the restaurant. Defendant followed them into this area and first saw Antwon in a small room in the back. What next occurred was described by defendant:

Q. Did you say anything at that point in time?

A. Well, when I had opened the door with my arm?

Q. Yes, sir.

A. Yeah, when I opened the door and Antwon was running and I told him, I said, "Hey, man, what you tripping off of?" Man, like he was running like he was—well, he was scared but to my knowledge when I opened the door he was running and I just wanted my property back, so when I opened the door I said, "What you tripping off of, man? I just want my chain back. That's all."

Q. Did he reply at all to you?

A. No. When I said, "All I want is my chain back"—he looked back when I said that.

. . . . .

---

1. The record indicates the parties were members of rival gangs.

2. We will discuss the facts viewed in the light most favorable to the defendant as defendant's

primary point on appeal is the trial court's failure to instruct the jury on self-defense. *See State v. Weems,* 840 S.W.2d 222, 226 (Mo. banc 1992).

Q. And, what did he do when he looked back?

A. When he looked back at me he looked back and then he had looked back forward and he stuck his arm out and he looked back at me again another time as if he was trying to reach for something but he ain't grabbed nothing so he kept looking back as if he was looking for something.

.    .    .    .    .

When he stood up he looked back when I replied, "All I want is my chain back," and he stuck his hand out and looked back at me again and he looked back to see whatever he was—whatever he was reaching for he was trying to see if the object was close to his hand when he kept—

Q. Did you know what he was reaching for?

A. No, at the moment I was real scared.

.    .    .    .    .

And, I was scared and when he looked back and when he reached and looked back at the way—the way towards he was running and he had reached—it appeared that he was reaching for something and I was already scared so in my mind how scared I was, it was a—I was scared, and when he looked back as if he was reaching for something I just shot.

Q. What was it that made you concerned about him reaching for something?

A. The way he was looking at me, when he look back forward as if—when he stuck his arm out he was reaching for something but when he looked back at me and looked back at the way he was running he was— his hand was in a motion like this as if he was trying to reach for whatever he was going to grab but he couldn't, you know, he just couldn't see—couldn't reach it.

Q. Were you worried about that?

A. Yeah.

Q. Why?

A. Because if he would have got his hand on whatever he was attempting to grab he

was going to hurt me and I was real scared.

Q. Was there any indication at that point in time when he was reaching for something or you thought he was reaching for something that he wouldn't use against you whatever it was he was reaching for?

A. No, he would have used it against me and he would have hurt me.

Q. And, this is the same individual that helped inflict injuries on you earlier, is that right?

A. Yeah.

Defendant then turned to leave the room and saw, through the glass door, Glenn running towards him. Glenn pushed the door open and defendant stepped back to avoid being hit by the door. Defendant lifted the gun and Glenn tried to take the gun from defendant. Defendant was scared Glenn would kill him if he got the gun so he discharged it. Defendant testified that he was so scared he "just kept discharging it."

Upon these facts, a jury convicted defendant of murder in the second degree and armed criminal action as to Antwon Williams and murder in the first degree and armed criminal action as to Glenn Carter. This appeal, consolidated with the appeal of the denial of defendant's *pro se* 29.15 motion, follows.

■ Defendant raises eight points on appeal. In his first two points,[3] defendant contends the trial court erred in refusing to submit a self-defense instruction as to Count I, the murder of Antwon Williams. These points may be addressed as one. A trial court must submit a self-defense instruction where such defense is supported by the evidence when viewed in a light most favorable to the defendant. *Weems,* 840 S.W.2d at 226. Failure to submit such an instruction constitutes reversible error. *Id.*

■ Use of deadly force in self-defense requires the following prerequisites: (1) an absence of aggression or provocation on the part of the defender, (2) a real or apparently

---

**3.** Defendant's second point contends the trial court erred in submitting the verdict director without a reference to a self-defense instruction.

real necessity for the defender to kill in order to save himself from an immediate danger of serious bodily injury or death, (3) a reasonable cause for the defender's belief in such necessity, and (4) an attempt by the defender to do all within his power consistent with his personal safety to avoid the danger and the need to take a life. *Id.* Evidence that supports a self-defense theory, however improbable, is sufficient to entitle defendant to a self-defense instruction. *Id.* at 227.

■ Upon reviewing the testimony of defendant, we find defendant had no *reasonable* cause to believe it was necessary to kill Antwon to save himself from immediate danger of serious bodily injury or death. Defendant's testimony reveals he saw Antwon "reaching for something" but could not identify what the object was. This testimony falls short because it would not support a finding that the "something" could cause immediate bodily injury or death. We find no error in the trial court's refusal to instruct on self-defense where the only evidence supporting the instruction was that defendant was "scared" and victim "reached for something." Point denied. Defendant's second point is moot.

■ In his third point, defendant contends the trial court erred in failing to correct, *sua sponte,* the self-defense instruction as to count II which omitted reference to prior threats and physical acts of violence of the victim, Glenn Carter, against the defendant. As defendant proffered this instruction without these modifications, he asks only for plain error review. *State v. Parker,* 886 S.W.2d 908, 928–29 (Mo. banc 1994). We will grant relief under plain error review if the error so substantially affects the rights of the accused that a manifest injustice or miscarriage of justice occurs. *State v. Fleer,* 851 S.W.2d 582, 592 (Mo.App.1993). Defendant testified as to the prior threats and acts of violence perpetrated upon defendant by Glenn Carter. We believe a rational jury could have considered this testimony in their decision as to whether defendant could reasonably believe the use of deadly force to

defend himself was necessary. No manifest injustice occurred due to the trial court's failure to correct the instruction. Point denied.

Defendant, in his fourth point, asserts the trial court erred in overruling defendant's *Batson* [4] motion. The state used all six of its peremptory strikes to remove African–Americans.

■ A trial court's determination regarding purposeful discrimination remains a finding of fact that will not be overturned on appeal unless clearly erroneous. *State v. Parker,* 836 S.W.2d 930, 939 n. 7 (Mo. banc 1992). If the trial court's finding is plausible under review of the entire record, an appellate court may not reverse it even if it would have weighed the evidence differently. *State v. Brinkley,* 753 S.W.2d 927, 930 (Mo. banc 1988).

In *Parker,* our supreme court, set out the proper procedure to follow when confronted with a timely *Batson* motion:

1. The defendant must raise a *Batson* challenge with regard to one or more specific venirepersons struck by the state and identify the cognizable racial group to which the venireperson or persons belong.

2. The trial court will then require the state to come forward with reasonably specific and clear race-neutral explanations for the strike.

3. If acceptable reasons are articulated, the defendant has the burden to show that the proffered reasons were pretextual and the strikes were racially motivated. *Parker,* 836 S.W.2d at 939.

At a *Batson* hearing, defendant timely challenged three of the state's six peremptory strikes and properly identified the cognizable racial group to which they belonged. The trial court then prompted the state to give racially neutral explanations for those strikes. We will address each strike in the order they appear in the transcript.

The first objection was to juror Matthew Carter. The state indicated Mr. Carter

4. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), held that the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution prohibits the use of peremptory challenges in a racially discriminatory manner.

worked for the Housing Authority as a drug counselor which put him in contact with people who are "law breakers." The state also pointed out that Mr. Carter had a degree in theology. The state suggested that for these reasons the state did not find Mr. Carter "healthy [as a] state minded juror."

Defendant then attempted to show that the proffered reasons were pretextual. Defendant indicated that the state's reasons do not "overcome the fact that the juror is black who deals with I would imagine predominantly black males of about the same age as this defendant, and that certainly is a racial reason for his being … struck."

The trial court overruled the *Batson* objection as to Mr. Carter holding that the state had struck Mr. Carter based on a legitimate "hunch" which was not based on race. *Batson* allows counsel to exercise peremptory challenges based on legitimate "hunches" and past experience so long as racial discrimination is not the motive. *State v. Antwine*, 743 S.W.2d 51, 65 (Mo. banc 1987). Defendant suggests, in his brief, that the state's reasons for striking Mr. Carter are "disingenuous and pretextual." We disagree. The state's reasons for striking Mr. Carter are legitimate "hunches." The trial court's overruling of defendant's objection as to the strike of Mr. Carter is not clearly erroneous.

The second objection was to the strike of Rosalind Cunningham. The state indicated it struck Ms. Cunningham because when asked if she knew anyone involved in the court system, she stated she was a cousin of Elbert Walton, Jr., who ran for the Office of Circuit Attorney. Defendant, however, failed to challenge the state's explanation. A defendant may not challenge an explanation of a prosecutor on appeal if he failed to challenge that explanation in the trial court. *State v. Plummer*, 860 S.W.2d 340, 346 (Mo. App.1993). The trial court's overruling of defendant's objection as to the strike of Ms. Cunningham is not clearly erroneous.

The third objection was to the strike of Essex Young. The state's reasons for striking Mr. Young was that Mr. Young nodded his head in agreement while another venire-person stated that she "felt" not only for the victims of this crime but also for the defendant. The state also indicated that Mr. Young had several children, one of which was near the age of the defendant. The state claimed Mr. Young could not give the state a fair trial.

The defendant attempted to show why these reasons were pretextual:

MR. SHAW: When he says in agreement that isn't—in agreement with what? That she has feeling for both the victim and the defendant? That's as neutral as you can be and he's nodding in agreement with that, that certainly doesn't—that's no different than the white juror, Cortopassi. And, the eighteen and nineteen year old kid, we got white people with eighteen year old children on here. (Tr. 32)

The trial court held the state's reasons were legitimate "hunches" and not pretextual. The trial court indicated that it also observed several jurors expressing their feelings by nodding their heads during this point in the voir dire. We find the trial court's overruling as to the strike of Mr. Young was not clearly erroneous. Point denied.

In his fifth point, defendant contends the trial court erred in overruling defendant's objections to the state's remarks during closing argument regarding defendant's trial rights vis-a-vis the victims' rights. Defendant's objections were of a general nature and no specific or valid reasons for the objections were given, leaving the trial court with little to rule on. *See State v. Wilson*, 888 S.W.2d 744, 748 (Mo.App.1994). We review only for plain error. *Id.* at 749.

"Appellate courts of this state rarely grant relief on assertions of plain error as to closing argument … because, in the absence of objection and request for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention. Because trial strategy looms as an important consideration in any trial, assertions of plain error concerning matters contained in closing argument are generally denied without explication," *State v. Bogard,*

836 S.W.2d 87, 89 (Mo.App.1992) (citations omitted).

Defendant has not shown that these comments had a decisive effect on the jury's determination. *State v. Woltering*, 810 S.W.2d 584, 588 (Mo.App.1991). We have reviewed the state's argument, and in light of the overwhelming evidence of defendant's guilt, we find no manifest injustice or miscarriage of justice. No jurisprudential purpose would be served by further discussion of this point. Point denied.

In his eighth point,[5] defendant contends the trial court erred in permitting the prosecutor to ask the venire if they could commit to the viewpoint that "just because a person stole something he should [not] be put to death" and discuss the subject with the venire.

A trial court has discretion in the control of voir dire and we will interfere with that discretion only where the record indicates a manifest abuse of discretion and the real probability of injury to the complaining party. *State v. McAlister*, 829 S.W.2d 549, 551 (Mo.App.1992).

During voir dire, the prosecutor indicated there would be evidence at trial that one of the victims stole something. He then asked the venire if "anybody here . . . believes that if a person steals something he should be put to death." Subsequent to defendant's overruled objection, the state continued to question the venire regarding this issue.

Defendant suggests this line of questioning was an impermissible attempt to obtain from the venire a commitment or pledge to act in a specific way if certain facts or contingencies arise at trial. *See State v. Crew*, 803 S.W.2d 669, 669 (Mo.App.1991). We disagree. Counsel may probe the venire for preconceived prejudices which would prevent the jurors from following the court's instructions. *Id.*

We have examined the questioning from voir dire and believe the prosecutor was merely attempting to elicit any potential sympathies the jurors may have for defen-

dant because the victims stole his chain. Any positive responses might bear upon the juror's ability to follow the trial court's instructions. We find no manifest abuse of discretion or injury to defendant from this line of questioning. Point denied.

Points six and seven of defendant's brief concern the denial of his Rule 29.15 motion for postconviction relief without an evidentiary hearing. On January 31, 1994, defendant filed a *pro se* motion for postconviction relief. Defendant alleged ineffective assistance of counsel because (a) "his attorney of record withdrew from the case during trial and did not request a mistrial to continue the case so that another attorney could adequately prepare the defense"; (b) "a list of prospective defense witnesses were neither contacted nor interviewed by either attorney of record"; and (c) "counsel failed to investigate the charges, file or hear any pre-trial motions or adequately prepare a defense."

Defendant's *pro se* motion indicated that he was represented by attorneys Neil Bruntrager and Mary Schroeder on the motion; however, only defendant signed the motion, and a search of the record reveals no entry of appearance was made by these attorneys in the postconviction relief proceedings. In fact, the docket sheet for defendant's postconviction relief proceedings indicates the only entry of appearance for defendant was by the public defenders office on February 4, 1994, the day the trial court denied defendant's motion.

Defendant contends the trial court erred in dismissing his *pro se* Rule 29.15 motion without an evidentiary hearing or an opportunity to amend the motion. Defendant also contends that counsel abandoned him by failing to enter an appearance and failing to file an amended motion.

Our supreme court has set out strict procedural safeguards for postconviction relief proceedings. In *Luleff v. State*, 807 S.W.2d 495 (Mo. banc 1991), the supreme court held where counsel determines that filing an amended motion is not warranted, counsel must make that determination part of the

---

5. For clarity, we review defendant's final point before addressing points six and seven which relate to the denial of defendant's Rule 29.15 motion for postconviction relief.

record. *Id.* at 498. Further, in the event of an absence of activity by counsel on movant's behalf, the motion court must make an independent inquiry regarding the performances of both movant and counsel. *Id.* In *McDaris v. State,* 843 S.W.2d 369 (Mo. banc 1992), the supreme court set out the requirements of such an inquiry. The court opined that "as part of its independent inquiry under *Luleff,* [the trial court should] inquire not only of postconviction counsel, but ensure that movant is informed of counsel's response and given an opportunity to reply." *Id.* at 371–72 n. 1. The court held that a sufficient record must be made that the motion court's determination is not clearly erroneous. *Id.*

▪ Here, the motion court's order indicates Neil Bruntrager and Mary Schroeder "telephonically informed the court that they also represent movant in [his *pro se* Rule 29.15 motion], and that that motion is joined in by them." (PCR L.F. 6) Other than this statement in the motion court's order, the record is completely devoid of any indication (1) that Mr. Bruntrager and Ms. Schroeder entered their appearance for defendant in his Rule 29.15 proceedings; (2) that such counsel made a determination that an amended motion is not warranted; (3) that the motion court made an independent inquiry regarding defendant's allegation of abandonment; or (4) that the motion court informed defendant of any response counsel may or may not have given to any such inquiry. Given the motion court's failure to comply with the mandates of *Luleff* and *McDaris,* we remand the cause to the motion court for its determination of whether counsel acted to ascertain whether an amended motion was warranted. The motion court shall then allow counsel to amend the motion if counsel determined an amended motion was warranted. The motion court shall make findings consistent with the mandates of *Luleff* and *McDaris. See Luleff,* 807 S.W.2d at 498.

The judgment of the trial court is affirmed with respect to defendant's direct appeal. The judgment of the motion court as to defendant's postconviction relief proceedings is remanded for further proceedings in accordance with this opinion.

SIMON and KAROHL, JJ., concur.